# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PEARLINE CLARKE, Individually and as :
the Administratrix of the Estates of Leroy :
"B.J." Brown, Jr. and Karen Clarke :
     Plaintiff, :
      :
v.                       : Civil Action No. 3:00CV717(CFD)
      :
THOMAS J. SWEENEY, Individually and :
in his Official Capacity as Chief of Police :
of the City of Bridgeport and THE CITY :
OF BRIDGEPORT, :
     Defendants. :

## RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case arises out of the shocking murders of a young boy and his mother by a

Bridgeport drug dealer named Adrian Peeler in January of 1999. Adrian Peeler killed Leroy

"B.J." Brown, Jr. and Karen Clarke to prevent them from testifying against his brother, Russell

Peeler, who was awaiting trial for the murder of Karen Clarke's boyfriend in the Connecticut

Superior Court.

The plaintiff, Pearline Clarke, is B.J.'s grandmother and Karen's mother,[1] and brought

this action individually and as the administratrix of Karen and B.J.'s estates. The defendants are

the City of Bridgeport and its former police chief, Thomas J. Sweeney. Pearline Clarke alleges

that by failing to adequately protect Karen and B.J. from the Peeler brothers, utilizing flawed

witness protection practices, and instituting a policy of encouraging minorities to cooperate with

the police, the defendants violated Karen and B.J.'s federal constitutional rights to due process

---

[1]To avoid confusion between Karen Clarke and Pearline Clarke, the Court will refer to
them at times as "Karen" and "Pearline."

1

and equal protection.  She also asserts the state law causes of action of negligence, gross negligence, and fraudulent misrepresentation.

This opinion considers the Defendants' Motion for Summary Judgment.  The defendants argue that they are entitled to summary judgment on each of the plaintiff's claims, and they also argue that the defendant Thomas Sweeney is entitled to qualified immunity on the claims arising under federal law.  For the following reasons, the motion is GRANTED as to the federal claims.

## I.  Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  Aldrich, 963 F.2d at 253. "Only when reasonable minds could not differ as to the import of the evidence is summary

2

judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992). "To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact, and that when any disputed facts are viewed in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 760 (2d Cir. 2003). Thus, "where the versions of the facts differ, [the court] must consider [the non-moving party's] version and make all possible inferences in her favor." Id. at 763. "Nevertheless, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. . . . Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Shannon v. New York City Transit Authority, 332 F.3d 95, 99 (2d Cir. 2003) (citations and internal quotation marks omitted).

## II.  Factual Background[2]

A.  Undisputed Facts

       On September 2, 1997, Russell Peeler attempted to kill Rudolph Snead in a drive-by shooting in Bridgeport while Snead sat in his car. Snead was shot by Peeler but recovered from his injuries. Apparently, the shooting was related to a dispute between Snead and Peeler regarding illegal drug trafficking. B.J. Brown, the eight-year old son of Karen Clarke,[3] was a

---

[2]The facts are taken from the parties' motion papers and Local Rule 9(c) statements and discovery materials filed by the parties. After the parties filed their Local Rule 9(c) statements, the Local Rules were renumbered. Previous Rule 9(c) is now Local Rule 56(a). Disputed facts are indicated in subsections II.B. and II.C., infra.

[3]Karen Clarke was Snead's fiancée.

passenger in Snead's car at the time of the shooting. Peeler was subsequently arrested on a charge of attempted murder of Snead. After posting bond on the attempted murder charge, Peeler threatened Snead to prevent him from testifying against him. Apparently unsatisfied with Snead's response to this threat, Peeler shot and killed Snead while he was on the telephone in a barbershop in Bridgeport on May 29, 1998.

Approximately one week after Snead's murder, B.J. Brown and Karen Clarke gave statements to the Bridgeport Police Department ("BPD"), which identified Russell Peeler as the person who had attempted to kill Snead in the drive-by shooting. Karen brought B.J. to the police department without any prior contact or encouragement by the police. On the basis of the statements given to the BPD by Karen and B.J., and other information set forth in the arrest warrant application,[4] Russell Peeler was arrested on June 15, 1998 for the murder of Snead.

Peeler was released on bond on July 1, 1998. On that date, Sergeant Michael Kerwin of the BPD authored an internal memo which indicated that Karen was a witness to the murder of Snead, that the alleged murderer had been released, and that he had a history of retaliating against witnesses. Kerwin's memo suggested that Karen's address should be "flagged for an appropriate response" in the event of a call for help. On the next day, July 2, 1998, the BPD, after a request from the Bridgeport State's Attorney's office, placed marked police cars in front of Karen and B.J.'s home on Garfield Avenue in Bridgeport to protect them from possible retribution by

---

[4]The arrest warrant application of June 11, 1998 identified a number of witnesses to the murder as well as to previous threats made by Russell Peeler to Snead. Although the statements of these witnesses were not attached to the application, it summarized the statements. See Pl.'s Opp. to Mot. for Summ. J. [Doc. # 54], Ex. F (arrest warrant application). Karen Clarke was identified in the application as a witness to two threats made by Peeler to Snead. The application indicated that the police also had a statement from an unnamed witness to the drive-by shooting of September 2, 1997. That witness was B.J. Brown.

Peeler.  However, the police cars were removed on July 8, 1998, the day that Peeler was returned

to jail after his bond was increased from $250,000 to $400,000 and he failed to post the

additional amount.  Peeler was again released on bond on July 13, 1998, but there were no police

cars assigned to Karen and B.J.'s residence after they were removed on July 8, 1998.  Also in

July of 1998, Karen and B.J. moved to a new residence on Earl Avenue in Bridgeport.  In August

1998, upon the request of Karen Clarke, Sergeant Kerwin arranged for B.J. to be transferred to a

different school because Peeler's children attended B.J.'s former school.

On December 23, 1998, the State's Attorney's Office turned over its witness list and

witness statements for Peeler's murder trial to Peeler's lawyer (which apparently included Karen

and B.J.'s police statements), but the Superior Court ordered that the names of the witnesses and

their statements not be disclosed to Peeler by defense counsel.[5]

On January 7, 1999, Karen and B.J. were murdered at their Earl Street residence by

Russell Peeler's brother, Adrian Peeler, at the direction of Russell to prevent them from

---

[5]Although the Connecticut Supreme Court indicated in its opinion in State v. [Adrian]
Peeler, No. 16571, 2003 WL 23221559, at *2 (Feb. 24, 2004 Conn.) (ruling on Adrian Peeler's
appeal of his conspiracy to commit murder conviction arising from Karen and B.J.'s murders)
that Russell Peeler did not know of the police statements of both Karen Clarke and B.J. Brown
until December 23, 1998, the record here does not indicate the arrest warrant application had
been sealed.  As a result, Karen Clarke's potential witness status was a matter of public record
and therefore available to Peeler in the summer of 1998.  However, it is not clear when Peeler
first learned that the anonymous witness described in the warrant application was B.J. Brown or
how he learned of that information.  See State v. [Russell] Peeler, 265 Conn. 460 (2003) (ruling
on Russell Peeler's appeal of the Snead murder conviction and related charges).  Although it is
likely Peeler knew of B.J.'s identity before then, the Court will assume that it was no later than
December 23, 1998, as the Connecticut Supreme Court stated.  See [Adrian] Peeler, No. 16571,
2003 WL 23221559, at *2.  Even if Russell Peeler learned of B.J.'s identity through disclosure of
the witness list or the disclosure of B.J.'s statement, in violation of the trial court's December
1998 protective order, or through some other means, there has been no evidence presented that
*Sweeney* ever disclosed that B.J. or Karen had given statements to the police or would be
witnesses at Russell Peeler's trial.

testifying at the Snead murder trial. Adrian Peeler entered Karen Clarke's home on Earl Avenue

and shot both her and B.J. Adrian Peeler was subsequently convicted of conspiracy to commit

the murders of B.J. and Karen. Russell Peeler was convicted of two counts of capital felony

murder.[6]

There was no police protection afforded to Karen and B.J. between the time the police

cars were removed from in front of their home on July 8, 1998, and the time that they were killed

in January 1999.

B. Disputed Facts

_____ As noted above "where the versions of the facts differ, [the court] must consider [the non-

moving party's] version and make all possible inferences in her favor." Cowan, 352 F.3d at 763.

However, although the Court considers all factual disputes in a light most favorable to the non-

moving party, in order to create a genuine issue of material fact, Fed.R.Civ.P 56 requires that

supporting affidavits "be made on personal knowledge [and] shall set forth such facts as would

be admissible in evidence. . . ." The Second Circuit has held that while this Rule does not

prevent a party from relying on affidavits that would themselves constitute hearsay, it does

require an indication that the party will be able to present those facts in a form that is admissible

at trial. See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to

defeat summary judgment must be admissible themselves or must contain evidence that will be

_____

[6]Adrian Peeler's conviction was affirmed by the Connecticut Supreme Court. See State v. [Adrian] Peeler, No. 16571, 2003 WL 23221559, at *2 (Feb. 24, 2004 Conn.). Russell Peeler's appeal is still pending before the Connecticut Supreme Court. See State v. [Russell] Peeler, Docket Nos. SC 16354/SC 16362. Russell Peeler was also convicted of murder and the attempted murder of Snead and risk of injury to B.J. and another child in Snead's car during the drive-by shooting, but those convictions were reversed by the Connecticut Supreme Court. See State v. [Russell] Peeler, 265 Conn. 460 (2003).

presented in an admissible form at trial."). See also H. Sand & Co. v. Airtemp Corp., 934 F.2d

450, 454-55 (2d Cir. 1991) ("hearsay testimony . . . that would not be admissible if testified to at

. . . trial may not properly be set forth in [a Rule 56] affidavit.") (internal quotation marks

omitted); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d

Cir. 1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary

judgment . . . absent a showing that admissible evidence will be available at trial").

        Pearline Clarke claims that there are genuine issues of material fact that 1) a subpoena

was issued by the prosecutors for B.J. and/or Karen to testify at Russell Peeler's murder trial; 2)

that Karen made several requests for police protection from the Peelers after the marked police

cars were removed on July 8, 1998, in the form of 911 calls, that were ignored by the BPD, and

3) that Karen never told the police that she did not want their protection, but only that she

believed that the presence of marked police cars in front of her residence put her in increased

danger.  The defendants argue that the only evidence of the alleged 911 calls is inadmissible

hearsay.  Moreover, the defendants claim that they have submitted evidence establishing that

Karen never made a 911 call after July 8, 1998 requesting protection from the Peelers.

Regarding the issue of the alleged subpoenas, the defendants claim that "no proof has been

provided to establish that such subpoena was ever actually issued by the prosecutor . . . ."  Each

of these evidentiary claims will be considered below as well as the purported evidence

concerning Karen Clarke's view on the type of police protection she sought.

        1. Subpoenas Issued for Karen Clarke and B.J. Brown by the State's Attorney's Office

        The defendants claim that Clarke has not submitted any evidence to establish that a

subpoena for Karen Clarke or B.J. was issued.  However, in her deposition, Janet Gordon (a

friend and cousin of Karen's) indicated both that Karen told her that she received a subpoena for

B.J., and that Gordon actually saw the subpoena:

> [Gordon]: [S]he [Karen] called me crying. She received a subpoena to bring B.J. into court. She asked me what did that mean. And I told her it meant that she would have to bring him in. It's the law. If she didn't, she'd be breaking the law.
>
> Q. Karen said to you that she actually received the subpoena?
>
> A. [Gordon]: She did.
>
> Q. She in fact did?
>
> A. [Gordon]: Yes, she did. *I saw it.* She did receive the subpoena. To tell you the exact date on it, I wouldn't be able to do it. But she did receive the subpoena.
>
> Q. Did you see it in Bridgeport?
>
> A. [Gordon]: Yes, she showed it to me when I came home.

Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 54], Ex. A (emphasis added). If Clarke's only

evidence for the existence of a subpoena were Gordon's testimony that Karen told her that one

had issued, such evidence would not satisfy the evidentiary standard of Rule 56, stated above,

because it would be inadmissible hearsay at trial. However, Gordon also indicates that she saw

the subpoena. If Gordon were to so testify at trial, such testimony would not be hearsay, but a

statement within Gordon's personal knowledge.[7]

The defendants have presented evidence that suggests that no subpoena was ever issued

for B.J. or Karen. They note that no subpoena was found among Karen's belongings after her

death and that the lead state prosecutor in the Snead murder trial did not know when the case was

---

[7]If Gordon were to testify as to the contents of the subpoena, such testimony may constitute inadmissable hearsay. However, the existence of the subpoena is within her personal knowledge.

8

to be tried at the time of Karen and B.J.'s death and therefore could not have issued a subpoena. While the jury might credit such testimony over the testimony of Janet Gordon and conclude that no subpoena was issued, that is not an appropriate determination for the Court on summary judgment. Viewing all the facts in a light most favorable to the plaintiff, the Court finds that a jury could credit Gordon's claim that a subpoena had issued for B.J. Brown and Karen Clarke.

    2. <u>Karen Clarke Requesting Continued Police Protection</u>

    Pearline Clarke has presented evidence that would likely be admitted at trial that Karen Clarke did not tell the police that she did not want further protection, but rather that she wanted the marked police cars to be removed from in front of her residence because she believed their presence placed her in greater danger by indicating that she was cooperating with the police. Clarke has offered the deposition testimony of Jeffrey Grice, one of the officers assigned to protect Karen between July 2 and July 8, 1998. In his deposition, Grice indicates that while Karen indicated that she was "uncomfortable with the police," she never did or said anything that led him to believe that she did not want to be protected by them, and that she seemed to accept the protection being offered. If Grice were to so testify at trial, his testimony regarding Karen's statements would not be considered for their truth because of their hearsay nature–i.e., that Clarke was uncomfortable with marked cruisers, but still wanted police protection. Rather, the statements would be admitted for the limited purpose of showing that the BPD received notice that Karen was at least not opposing continued protection from the Peelers. <u>See</u> Fed.R.Evid. 801; <u>Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.</u>, 257 F. Supp. 2d 751, 762 (S.D.N.Y. 2003) ("Statements . . . offered for their effect on [a party's] state of mind are not considered hearsay."). However, it is also important to note that Clarke has submitted no evidence from

9

which a jury could infer that Sweeney had any personal knowledge of such statements.

3. 911 calls by Karen Clarke

Pearline Clarke also claims that Karen made numerous calls to the police requesting protection from Russell Peeler after the police cars were removed from in front of her Garfield Avenue residence on July 8, 1998. However, the only evidence offered are the depositions of Janet Gordon and Karen's cousin Kerry Clarke ("Kerry"), and Gordon's statement to the BPD on January 12, 1999. Both Gordon and Kerry Clarke claim that Karen told them she called the police after seeing Russell across the street from her Earl Avenue apartment. See Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 54], Ex. A (Aff. of Janet Gordon) ("Karen said she called 911"); Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 54], Ex. J (Aff. of Kerry Clarke) ("[E]ach time she [Karen] saw him [Peeler], she called the police. Q. Is that what she told you? A. Yes."). However, if Kerry or Gordon were to testify at trial that Karen told them she had called the police and requested protection from Russell Peeler, such statements would be inadmissible hearsay. Even the "residual exception" of Rule 807 would not permit these statements to be considered, as Clarke has not identified any "circumstantial guarantees of trustworthiness." Fed.R.Evid. 807. Indeed, other evidence suggests that the statements are not reliable. The defendants have produced evidence of the records of the 911 calls to the BPD by Karen Clarke in this time period, which indicates that while Karen made several calls to the police between July 8, 1998 and the time of her death, none of those calls was about the Peelers, her fears of Russell Peeler, or any matters related to this case. In addition, unlike the proposed testimony of Officer Grice, which would be admissible to show that the BPD had notice of Karen's position on police protection, testimony by either Kerry Clarke or Janet Gordon regarding the alleged 911 calls

10

would be hearsay even for the purpose of demonstrating that the BPD had notice of the calls. Thus, in reviewing the defendants' summary judgment motion, the Court cannot consider that Karen made calls to the police after July 8, 1998 indicating that she felt threatened by Russell Peeler and requested police protection from him.

            As stated above, "any disputed facts are viewed in the light most favorable to the non-moving party . . . " Cowan, 352 F.3d at 760. Therefore, for the reasons stated above, in addition to the undisputed facts, the Court will assume for purposes of summary judgment consideration that Karen and B.J. were the subjects of a subpoena to testify in the Rudolph Snead murder case, and that Karen Clarke did not ask that the police protection afforded to her and B.J. between July 2 and July 8, 1998 be withdrawn. However, the Court will not assume that Karen made calls to the police after July 8, 1998 requesting protection from Peeler.

C.  Additional Disputed and Undisputed Facts Regarding Defendant Sweeney

        The parties also dispute how much personal knowledge Defendant Sweeney had regarding the events and information described above. Pearline Clarke seems to claim that Sweeney knew of the Peeler murder prosecution, and therefore of the threat that the Peelers posed to Karen and B.J. However, in his deposition testimony, Sweeney indicated that until he learned of the deaths of Karen and B.J., he had no knowledge of the Russell Peeler murder prosecution, that B.J. Brown had given the police a statement implicating Russell Peeler in that case, or that some police protection had been afforded Karen and B.J. While Clarke has submitted evidence from which the jury could find that other members of the BPD were certainly aware of the Peeler murder prosecution and of the threat that the Peelers posed to Karen and Brown, and were involved in the decisions to at first afford police protection to them, she has not

11

submitted any evidence that *Sweeney* had any personal knowledge of these facts prior to the homicides.[8]

Although the parties have not raised this issue, there may also be a considerable question about whether Sweeney or the City of Bridgeport had any role in issuing the subpoenas for B.J. and Karen.  It appears that the issuing authority for such trial subpoenas would be the State of Connecticut State's Attorney's Office for the Judicial District of Fairfield.  However, because the defendants have not pressed this issue and because the BPD may have had a role in the issuance or service of such subpoenas, the Court will consider the subpoenas in its substantive due process analysis below.  However, there is no evidence that Chief Sweeney had a role in the subpoena process or knew of them.

As the basis for her equal protection claim, detailed below, Clarke also alleges Sweeney, as the Chief of the Bridgeport Police Department, developed a policy of "encourag[ing] minority citizens like [Karen] Clarke to cooperate in pursuing criminals by coming forward as witnesses." Pl.'s Opp. to Mot. for Summ. J. [Doc. # 53], at 12.  She claims that even though Sweeney "knew that for a witness from the minority community to be seen in their neighborhoods with police officers would create a danger of retaliation against that witness" id. at 6, he nevertheless failed to establish procedures to protect the witnesses that were encouraged to come forward under this policy.  Clarke also makes a "selective enforcement" equal protection claim, claiming that the BPD under Sweeney had a "facially neutral" witness protection policy that was applied

---

[8]Sweeney testified at his deposition that he was generally aware of the Peeler brothers and their propensity for violence and of Russell Peeler's arrest for the attempted murder of Snead. See Pl.'s Opp. to Def.'s Mot. for Summ. J., [Doc. # 54], Ex. D, at 96-97, 135 (Dep. of Thomas J. Sweeney).

differently to minority witnesses than to non-minorities.

Clarke has submitted evidence, in the form of Sweeney's deposition, from which a jury could find that Sweeney did work to encourage cooperation from the minority community in Bridgeport in coming forward as witnesses to crimes. However, Clarke has not presented any evidence that Karen and B.J. were aware of such a policy or that their cooperation with the BPD was motivated by such a policy.[9] Thus, for purposes of considering the summary judgment motion, the Court will assume that Sweeney initiated such a policy of encouraging minority cooperation with law enforcement, but it will not consider that Karen and B.J. were affected by that policy or that their cooperation was a product of it. Clarke has also failed to submit any evidence that non-minority witnesses were treated any differently than minority witnesses.

### III.  Summary of Complaint

The complaint contains nine counts. The first eight counts are asserted against Chief Sweeney. The first three are based on 42 U.S.C. § 1983 and are directed against Chief Sweeney in his individual and official capacities. Count one asserts a substantive due process claim against Sweeney, alleging that by failing to protect B.J. and Karen from the Peelers Sweeney violated Karen and B.J.'s right to due process as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution. Count two asserts that Sweeney's acts were motivated by racial animus and therefore deprived Karen and B.J. of equal protection under the Fourteenth

---

[9]While it is true the Court must view any disputed facts "in the light most favorable to the non-moving party," Cowan, 352 F.3d at 760, here there is no genuine dispute. "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. . . . Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Shannon, 332 F.3d at 99 (citations and internal quotation marks omitted).

Amendment.  Count three alleges that Sweeney failed to properly train and supervise the officers under his command despite being aware of policies and practices that led to the denial of equal protection of the laws for African Americans, and that this failure to train and/or supervise led to the deaths of Karen and B.J.

Counts four through eight are based on Connecticut law.  Count four sounds in fraud and asserts that Sweeney made "numerous representations" to Karen and B.J. that they would be afforded police protection from the Peelers and that those representations were made with knowledge that they were false and in order to induce Karen and B.J.'s cooperation.  Count five makes the same allegations as count four, except that it alleges that the misrepresentations were made negligently, rather than intentionally.  Count six asserts that Sweeney's actions violated Conn. Gen. Stat. § 52-555 (Connecticut's Wrongful Death statute).  Counts seven and eight assert claims of common law negligence and gross negligence.

The ninth and final count is asserted against the City of Bridgeport; it alleges that B.J. and Karen were deprived of their right to due process under the Fifth and Fourteenth Amendments to the Constitution in violation of 42 U.S.C. § 1983 as the result of a "policy, practice, custom or usage" of the City, under Monell v. Dept. of Social Services, 436 U.S. 658 (1978).

The defendants claim they are entitled to summary judgment on each of the nine counts. They also assert that Sweeney is entitled to qualified immunity for the alleged violations of Karen and B.J.'s federal constitutional rights asserted in counts one, two and three.

## IV.  Analysis

A.  Counts One and Three - Substantive Due Process

Title 42 U.S.C. § 1983 provides that any person who, acting under color of state law,

14

"subjects or causes to be subjected, any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws" of the United States shall be liable to the injured party in actions at law.  42 U.S.C. § 1983.  In count one of the complaint, Clarke asserts that Sweeney violated B.J. and Karen's constitutional rights under the Fifth and Fourteenth Amendments to the U.S. Constitution by "his failure to take appropriate steps to protect B.J. and [Karen] from the known threat that the Peelers posed to them, to take appropriate steps to monitor Russell Peeler and to take appropriate steps to apprehend Adrian Peeler" (prior to the murders).[10]  The defendants claim both that the failure to protect a witness under the circumstances here does not constitute a violation of the Fifth and Fourteenth Amendments and, in the alternative, even if Sweeney's actions and omissions did violate B.J. and Karen's constitutional rights, he is entitled to qualified immunity for his actions.[11]

In DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), the United States Supreme Court considered when a government official's failure to protect an individual from private harm could constitute a denial of due process.  In that case, the defendant Winnebago County Department of Social Services ("DSS") received complaints that Joshua DeShaney, a four-year old child, was being severely abused by his father, with whom he lived. 489 U.S. at 192.  Approximately a year after these initial complaints, Joshua was admitted to the

---

[10]Count three appears to assert a supervisory liability claim against Sweeney on a similar basis and is discussed below.

[11]Although the plaintiff's complaint also cites the Fourth Amendment as the basis for her DeShaney claims, the courts have generally agreed that both DeShaney exceptions–"state-created danger" and the "special relationship"–are rooted in the Fifth and Fourteenth Amendment substantive due process for state officials, as more fully discussed below.

hospital with bruises and abrasions.  Id.  The examining physician suspected child abuse and

notified the DSS.  Id.  After the juvenile court placed Joshua in the temporary custody of the

hospital, the DSS decided–after consultation with a "Child Protection Team" that included a

pediatrician, a psychologist, and a police detective–that there was insufficient evidence of child

abuse to warrant keeping Joshua in state custody.  Id.  The DSS did recommend, however,

placing Joshua in a special preschool program and providing counseling for his father.  Id.  The

juvenile court, following the DSS recommendation, returned Joshua to his father's custody.  Id.

Over the next several months, Joshua was admitted to the hospital for treatment of "suspicious

injuries" twice and his DSS caseworker observed a number of indicia of abuse during visits to his

home, but the DSS did not take any action to remove him from his father's custody.  Id. at 192-

93. Ultimately, Joshua was beaten by his father so severely that he suffered permanent brain

damage.  Id. at 193.  Joshua and his mother filed suit against the DSS and certain of its

employees alleging that "by failing to protect him against a risk of violence at his father's hands

of which they knew or should have known," the defendants deprived Joshua of his liberty

without due process of law.  See DeShaney, 489 U.S. at 193.[12]  After the Seventh Circuit rejected

the due process claim, the Supreme Court granted certiorari to decide "when, if ever, the failure

of a state or local governmental entity or its agents to provide an individual with adequate

protective services constitutes a violation of the individual's due process rights."  Id. at 194.  The

Court held that the state's failure to remove Joshua from his father's custody, despite knowledge

---

[12]The Court in DeShaney noted that "[t]he claim is one invoking the substantive rather
than the procedural component of the Due Process Clause; petitioners do not claim that the State
denied [plaintiff] protection without according him appropriate procedural protections."
DeShaney, 489 U.S. at 195.  Here, too, the plaintiff invokes substantive, rather than procedural,
due process.

of previous abuse, did not constitute a violation of substantive due process:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.  The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means . . . .   If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

Id. at 195-197.

The defendants here argue that, pursuant to DeShaney, Sweeney and the City were under no obligation to provide increased protection to Karen Clarke and B.J. Brown from the Peelers. However, the Court in DeShaney, in dicta that has generated considerable commentary and been applied in many lower court decisions, suggested that certain factual situations might justify exceptions to the general principle that the Due Process Clause does not give rise to a constitutionally protected right of protection from the conduct of private actors.  The plaintiff argues that two of these exceptions–the "state-created danger" exception and the "special relationship exception"–apply to Sweeney's conduct here.  Each is examined below.

1. The "state-created danger" exception

In its opinion in DeShaney, the Supreme Court noted that the State had played no role in creating the dangers to Joshua, "nor did it do anything to render him any more vulnerable to them."  Id. at 201.  Citing this language, the Second Circuit, in Dwares v. City of New York, 985 F.2d 94 (2d Cir. 1993), stated that "[w]e read the DeShaney Court's analysis to imply that, though an allegation simply that police officers had failed to act upon reports of past violence

17

would not implicate the victim's rights under the Due Process Clause, *an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights*." 985 F.2d at 99 (emphasis added). Clarke claims that this case falls within this exception to <u>DeShaney</u> and that the defendants had an affirmative obligation to provide better protection to Karen and B.J. from the Peelers because Sweeney and the City rendered Karen and B.J. more vulnerable to harm from the Peelers by providing them with visible police protection (thereby "announcing" their cooperation with the authorities) and then withdrawing that protection.[13]

In <u>Dwares</u>, the plaintiff was involved in a flag-burning demonstration when he was beaten by counter-demonstrators. The complaint

> went well beyond allegations that the defendant [police] officers merely stood by and did nothing . . . It alleged that the officers conspired with the 'skinheads' to permit the latter to beat up the flag burners with relative impunity. . . . It requires no stretch to infer that such prior assurances would have increased the likelihood that the 'skinheads' would assault demonstrators. . . . Such a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause.

<u>Dwares</u>, 985 F.2d at 99. However, the allegations in <u>Dwares</u>–and the basis for the Second Circuit's decision–are distinguishable from the case here as there is nothing in the record indicating that Chief Sweeney or any of his subordinates encouraged the Peelers in any way or

---

[13]The defendants claim that the police protection was withdrawn at Karen Clarke's request, while the plaintiff claims that Karen merely asked that the marked police cars be withdrawn. As noted above, for purposes of this summary judgment motion, which requires the Court to view the facts in a light most favorable to the plaintiff, the Court assumes that Karen did not ask for all police protection to be withdrawn.

The plaintiff's papers also appear to assert that Sweeney and the BPD "created" or "enhanced" the danger to B.J. and Karen through their policy of minority outreach. However, as noted above, there is nothing in the record to indicate Karen or B.J.'s cooperation was caused by such a policy.

affirmatively permitted them to victimize Karen Clarke and B.J. Brown.

The Second Circuit has not specifically considered whether the "state created danger exception" to DeShaney applies to fact witnesses for whom visible police protection was provided and then withdrawn. This question also does not appear to have been addressed in any other circuit, but an examination of similar "state created danger" cases from other circuits and from district courts in the Second Circuit is useful in analyzing the boundaries of that exception. In Kallstrom v. City of Columbus, 136 F.3d 1055 (6th Cir. 1998), for example, the Sixth Circuit considered a § 1983 action by undercover police officers alleging that the release of personal information from their personnel files such as home addresses, photographs, and information about other family members to counsel for the drug conspirators they had investigated violated their substantive due process rights. The Court held that, applying the state created danger exception to DeShaney, "the City's actions placed the officers and their family members in 'special danger' by substantially increasing the likelihood that a private actor would deprive them of their liberty interest in personal security." Kallstrom, 136 F.3d at 1067. The Court reasoned that

> [l]iability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence. . . . However, because many state activities have the potential to increase an individual's risk of harm, we require plaintiffs alleging a constitutional tort under § 1983 to show "special danger" in the absence of a special relationship[14] between the state and either the victim or the private tortfeasor. The victim faces "special danger" where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large. . . . The state must have known or clearly should have known that its actions specifically endangered an individual.

Id. at 1066. Clarke argues that, as in Kallstrom, by placing marked cruisers in front of Karen and

_____

[14]The Court will address the special relationship exception to DeShaney, infra.

B.J.'s home the state created, or at least enhanced, the danger that the Peelers posed to them.

Also, Clarke argues, as in <u>Kallstrom</u>, the "danger" that the state allegedly created or enhanced

was specific to Karen and B.J., rather than "a risk to the public at large."  However, an important

distinction is that in <u>Kallstrom</u>, the potential victims of private violence were undercover law

enforcement officers who, because of the nature of their government job assignments, were

required to be in close contact with the individuals who posed the potential threat if the officers'

identities were exposed.  In contrast, Karen and B.J. were simply fact witnesses in a criminal

investigation, and the government had no role in creating the situation which resulted in the

danger to them.

In <u>Kneipp v. Tedder</u>, 95 F.3d 1199 (3d Cir. 1996), the plaintiff was a pedestrian who had

been stopped by the police while she was walking home from a bar with her husband on a cold

winter evening.  After directing the plaintiff's husband to walk home alone, the police officers

left the severely intoxicated plaintiff alone in the street.  <u>Id.</u> at 1202.[15]  The plaintiff was unable to

find her way home and was found unconscious several hours after the police had left her.  <u>Id.</u> at

1203.  Her exposure to the extreme cold caused hypothermia which led to permanent brain

damage.  <u>Id.</u>             After the district court granted summary judgment to the defendant police

officers, the Third Circuit reversed and held that the plaintiff's case "presents the right set of

facts which, if believed, would trigger the application of the state-created danger theory."  <u>Id.</u> at

1205.  The Court applied a four part test it had developed in <u>Mark v. Borough of Hatboro</u>, 51

F.3d 1137 (3d Cir. 1995):

---

[15]The police officers were still with the plaintiff when her husband left the scene, and her
husband testified that he assumed the police were going to take his wife to either the hospital or
the police station.

We found that cases predicating constitutional liability on a state-created danger theory have four common elements:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

[citing Mark, 51 F.3d at 1152.] We further noted that "[t]he cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors leaving a discrete plaintiff vulnerable to a foreseeable injury." Id. at 1153. Those courts which have recognized the state-created danger theory have employed a deliberate indifference standard. [citations omitted].

Kneipp, 95 F.3d at 1208. The Court found there were at least genuine issues of material fact as to each of the four elements and held that the "police officers used their authority as police officers to create a dangerous situation or to make [the plaintiff] more vulnerable to danger had they not intervened . . . It is conceivable that, but for the intervention of the police, [the plaintiff's husband] would have continued to escort his wife back to their apartment where she would have been safe." Id. at 1209.

Here, looking at the facts in a light most favorable to Clarke, she fails to satisfy several of the Kneipp factors if they were to be adopted by the Second Circuit. First, the harm here was not "fairly direct." In Kneipp, the harm to the plaintiff occurred the very same night as the police intervention, while here it is undisputed that the homicides took place nearly six months after the police cars had been removed from in front of Karen Clarke's apartment.[16] As to the second element, there is no evidence that Sweeney "wilfully disregarded" the safety of Karen and B.J. or

---

[16]There has been no evidence presented that the Peelers ever learned of the issuance of the trial subpoenas to B.J. and Karen, which would have occurred closer in time to their murders. There also has been no evidence presented that Sweeney knew of the issuance of the subpoenas or of the disclosure of B.J. and Karen's witness status on December 23, 1998. See fn.5, supra.

created an opportunity for the Peelers to harm Karen and B.J.  Also, the temporary assignment of the police cruisers would not satisfy the third prong of Kneipp that there be some "relationship between the state and the plaintiff."[17]  Finally, the use of the police cruisers are also not enough to satisfy the element that "the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur;" there is no evidence that the BPD made it easier for the Peelers to victimize Karen or B.J.  Their vulnerability to the Peelers was no greater than before the limited police protection was provided on July 2, 1998.

In Estate of Rosenbaum v. City of New York, 975 F. Supp. 206 (E.D.N.Y. 1997), the District Court for the Eastern District of New York denied summary judgment on the basis of this aspect of DeShaney, holding that there were genuine issues of material fact as to whether the defendants had created or increased the danger to the plaintiffs.[18]  In Rosenbaum, the plaintiffs were members of the Crown Heights Hasidic Jewish community that were injured in the riots that followed an automobile accident in which a young African-American boy was killed after being struck by a car containing members of the Hasidic Community.  975 F. Supp. at 209.  The plaintiffs brought an action against the City, the mayor, and the police chief alleging that "by failing to arrest individuals for unlawful assembly and by ignoring pleas for assistance . . . the Police Department emboldened participants in the violence and increased the danger to the Hasidic Community."  Id. at 216.  The Court held that there were genuine issues of material fact as to whether the state created danger exception to DeShaney applied:

---

[17]This third prong of Kneipp appears to be similar to the "special relationship" exception to DeShaney that is more fully addressed below.

[18]However, the Court granted summary judgment to the defendant police chief on the basis of qualified immunity.  See Rosenbaum, 975 F. Supp. at 226.

> If the plaintiffs contended simply that the City had failed to respond to requests from the Hasidic community for additional police protection during the Crown Heights disturbances, such a claim would arguably be barred by <u>DeShaney</u> . . . .  However, the thrust of plaintiffs' argument is quite different: plaintiffs allege that defendants, by the inappropriate implementation of a policy of restraint, actually exacerbated the danger to the Hasidic community and rendered the community more vulnerable to violence by private actors.

<u>Id.</u> at 217.  Unlike the allegations in <u>Rosenbaum</u>, the police here did not choose not to enforce the law against the Peelers, thus encouraging their violence, but rather merely withdrew the limited police protection afforded B.J. and Karen, leaving them in the same position as existed before July 2, 1998.

In <u>Pietrowski v. City of Houston</u>, 237 F.3d 567 (5th Cir. 2001), the plaintiff was shot by a "hit man" hired by her ex-boyfriend.  237 F.3d at 572.  After the plaintiff's relationship with her ex-boyfriend had ended, the ex-boyfriend convinced some of his friends on the Houston Police and Fire Departments to threaten the plaintiff with false charges of arson and theft if she did not agree to release her ex-boyfriend from all common law marriage and paternity claims.  The plaintiff also alleged that the Houston Police Department was aware that a man had been hired by her ex-boyfriend to murder her, but that her ex-boyfriend's friends in the Department used their influence to prevent her from being warned and then attempted to shield her ex-boyfriend from the investigation after the shooting.  <u>Id.</u> at 574.  After trial, the jury found in favor of the plaintiff on her state created danger claim.  <u>Id.</u> at 576.

The Fifth Circuit reversed, holding that the facts could not support application of the state created danger exception to <u>DeShaney</u>.  The Court held that the state created danger exception requires the plaintiff to demonstrate "that the state actors increased the danger to her . . . [and] that the state actors acted with deliberate indifference."  <u>Id.</u> at 584 (citations omitted).  The Court

reasoned that "the City actors did not create the danger she faced. . . .   The record clearly

demonstrates that [the plaintiff] was aware of [her ex-boyfriend's] propensity for violence . . . .

[and] knew [he] was trying to kill her.  Unlike other cases in which government officials placed

persons in danger, the City at most left her in an already dangerous position."  Id.  Nor had the

action of the government officials increased the danger to the plaintiff:

> [S]ome cases interpret the state-created danger theory to result in § 1983 liability if
> government actors increase the danger of harm to a private citizen by third parties.
> Measured by this standard, the assistance provided [to the private investigator working
> for the plaintiff's ex-boyfriend] consisted of furnishing [the plaintiff's] mug shot and
> failing to warn her . . . .   Neither of these circumstances, however, actually increased the
> danger to her.

Id. at 584-85.

As the review of these decisions suggests, the boundaries of the state created danger

exception to DeShaney are not entirely clear and decisions such as Piotrowski may not be

altogether consistent with other decisions applying the language of DeShaney which is the basis

for the "state created danger" cause of action under the Due Process Clause.  However, it seems

clear that this exception requires that the state actors do more than simply temporarily assign

marked police cars for the protection of witnesses to crimes.  This exception requires that the

government defendant either be a substantial cause of the danger the witness faces or at least

enhance it in a material way.  Certainly, the BPD could have provided better protection for B.J.

Brown and Karen Clarke.  However, that does not mean that a violation of the U.S. Constitution

occurred.[19]  Here, the danger posed by the Peelers was not the creation of the state.  Nor did the

---

[19]There is now a Connecticut statutory right to such protection precipitated by the Karen
Clarke and B.J. Brown situation.  See Conn. Gen. Stat. §§ 54-82s - 54-82u ("The Leroy Brown,
Jr. and Karen Clarke Witness Protection Program.").

actions of the police provide the Peelers with an opportunity to harm Karen or B.J.  Thus, the Court finds that the state created danger exception to DeShaney is inapplicable based on the undisputed facts of this case as well as the disputed facts considered in a light most favorable to the plaintiff.[20]

2.  "Special Relationship"

DeShaney has also been interpreted as recognizing another exception to the general rule that the Due Process Clause does not impose on the state an affirmative obligation to protect its citizens from private tortfeasors–the so-called "special relationship" exception:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . .  The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic needs–e.g. food, clothing, shelter, medical attention, and reasonable safety–it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney, 489 U.S. at 200 (citations omitted).  The Supreme Court held that this "special

---

[20]Some courts have held that, even in situations where the state created danger exception gives rise to an obligation to provide protection, state actors will only be held to have breached that obligation if their affirmative actions "shock the conscience":

> This obligation to protect persons from harm inflicted by third parties, however, does not automatically render state officials liable for the injuries that an individual suffers due to the actions of these private actors.  Instead where such a duty exists, state actors are liable for breaching their obligation to the plaintiff only if they engaged in conduct that was so egregious that it can be said to be arbitrary in the constitutional sense. . . . [T]he Fourteenth Amendment protects only against abuse of executive power which shocks the conscience.

May v. Franklin County Bd. of Comm'rs, 59 Fed. Appx. 786, 793 (6th Cir. 2003) (citing Sperle v. Mich. Dep't of Corrections, 297 F.3d 483, 491 (6th Cir. 2002).  Here, because there was no constitutional obligation to protect Karen and B.J., the Court need not reach the issue of whether the defendants' actions or inactions "shock the conscience."

relationship" exception did not apply there, noting that "[t]he affirmative duty to protect arises

not from the State's knowledge of the individual's predicament or from its expressions of intent

to help him, but from the limitation which it has imposed on his freedom to act on his own

behalf." Id.

Pearline Clarke argues that, unlike Joshua DeShaney, Karen Clarke and B.J. Brown had

limitations on their movement imposed by the State, and therefore the special relationship

exception applies. Specifically, Clarke claims that Karen and B.J. were not free to leave the

Bridgeport area because they had been subpoenaed to testify in the criminal trial of Russell

Peeler. No court appears to have considered whether the issuance of a subpoena to a fact witness

to testify in a criminal trial satisfies the "special relationship" exception giving rise to an

affirmative constitutional obligation for the state to provide protection to the subpoenaed

individual. Although it pre-dates DeShaney, Doe v. New York Dep't of Social Servs., 649 F.2d

134 (2d Cir. 1981) is of some guidance. In Doe, the plaintiffs were foster children that alleged

they had been abused by their foster parents. They brought an action against the New York

Department of Social Services, claiming that its employees had not properly supervised and

monitored their foster care placements. In assessing this claim, the Second Circuit held that

"[w]hen individuals are placed in custody or under the care of the government, their

governmental custodians are sometimes charged with affirmative duties, the nonfeasance of

which may violate the constitution." 649 F.2d at 141.

In G-69 v. Degnan, 745 F. Supp. 254 (D.N.J. 1990), the New Jersey District Court

specifically considered the special relationship exception to DeShaney in a situation closer to the

one here, involving undercover witnesses. In that case, the plaintiffs, confidential government

informants, alleged that state prosecutors and police officers had violated their due process rights by failing to honor an agreement to place them in a witness protection program if their identities were compromised.  The plaintiffs claimed that the "defendants' actions in placing plaintiffs in a dangerous situation created a special relationship which carried with it a duty to protect plaintiffs."  Id. at 262-63.  In assessing the claim, the court noted that "[s]ince DeShaney, courts have struggled with whether state conduct short of actually taking a person into physical custody is sufficient to create a special relationship such that an affirmative duty is owed."  Id. at 264.  However, the District Court held that

> [t]his court agrees with plaintiffs that an informant such as [the plaintiff] is in a "special relationship" with the state where, as here, both parties anticipate that the informant's activities, if discovered, could result in a threat to the life of the informant. It is difficult to imagine that a person would enlist for such a dangerous position absent some guarantee of personal safety. Having made such a guarantee, when there is so clear a risk to an individual's life and liberty, the state may not, consistent with the Constitution, walk away from the bargain. Plaintiffs have presented evidence sufficient for a finder of fact to conclude that the state induced [the plaintiff] to work as an undercover informant, and that the state promised [the plaintiff] protection and a new identity in the event that his identity was discovered, a promise upon which G-69 relied.

Id. at 265.

G-69 is different from this case for several reasons, however.  First, there is no evidence that Karen and B.J. were promised protection in exchange for their statements or their testimony.  Second, the state did not cause Karen or B.J. to interact with the Peelers in order to obtain evidence against them; in G-69 the witnesses were placed by the government in dangerous situations to develop the evidence against the targets.  Clarke essentially asks this Court to expand upon the reasoning of G-69 to include not just confidential informants enlisted by the government, but fact witnesses subject to a subpoena whose involvement as witnesses was not

27

caused by any police encouragement.

Most courts to have considered the special relationship exception have focused on the rationale articulated in DeShaney that "the state so restrains an individual's liberty that it renders him unable to care for himself." DeShaney, 489 U.S. at 200. See, e.g., Christiansen v. City of Tulsa, 332 F.3d 1280 (10th Cir. 2003) ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf"); Brown v. Pennsylvania Department of Health Emergency Medical Training Institute, 318 F.3d 473 (3d Cir. 2003) ("The 'special relationship' exception is applicable 'when the State takes a person into its custody and holds him there against his will' or, where 'the State, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself.'") (citations omitted). However, any restraints on Karen and B.J.'s freedom of movement and ability to protect themselves posed by the subpoenas or even the presence and later removal of marked police cars did not rise to the level of a "limitation . . . on [Karen and B.J.'s] freedom to act on [their] own behalf" and therefore did not satisfy the requirements of the special relationship exception.

As with the state created danger exception to DeShaney, the contours of the special relationship exception are not well defined. However, it would not seem to apply when a fact witness to a crime that has already been committed voluntarily approaches the police and makes a statement, and then a subpoena is issued for that witness–even if the police provide the witness with visible police protection that is later withdrawn. Such a circumstance does not constitute a situation where the "state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty." Thus, even looking at the facts in a

28

light most favorable to Clarke, the special relationship exception to <u>DeShaney</u> is also

inapplicable here.            3.  <u>Personal Involvement and Supervisory Liability of Sweeney</u>

_____Liability under § 1983 requires that the defendant have some "personal involvement" in

the alleged constitutional deprivation.  <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) ("It

is well settled in this Circuit that personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983.") (citation and internal

quotation marks omitted).  As noted above, there is nothing in the record from which the jury

could conclude that Chief Sweeney had any personal involvement in–or had any direct

knowledge of–the actions of the BPD that Clarke alleges resulted in the homicides of Karen and

B.J.  For example, there is no indication that Sweeney was aware of a subpoena for either Karen

or B.J. or that he was aware that she or the prosecutors requested that police protection be

provided to Karen and B.J. (and that this protection was provided and then later withdrawn).

Indeed, there is no evidence to suggest that Sweeney had any personal knowledge that B.J. and

Karen were to be fact witnesses at the Snead murder trial until after their homicides.

However, "[i]n certain situations, a supervisor may be held liable under Section 1983 for

a constitutional violation committed by a subordinate."  <u>Santana v. City of Hartford</u>, 283 F. Supp.

2d 720, 728 (D. Conn. 2003).[21]  Yet because of § 1983's requirement of "personal involvement,"

supervisory liability cannot rest on a theory of respondeat superior.  <u>See</u> <u>Hayut v. State University</u>

<u>of New York</u>, 352 F.3d 733, 753 (2d Cir. 2003) ("It is well settled . . . that the doctrine of

_____

[21]As mentioned, count three of the complaint appears to assert supervisory liability
against Sweeney for the § 1983 claims in counts one and two.  That aspect of count three
concerning substantive due process is addressed here.  That aspect of count three concerning
equal protection is addressed below.

respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity."); Wright, 21 F.3d at 144 ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior"); Stewart v. John Dempsey Hosp., No. 303CV1703WWE, 2004 WL 78145, at *3 (Jan. 9, 2004 D. Conn.) ("Section 1983 imposes liability only on the official causing the violation. Thus, the doctrine of respondeat superior is inapplicable in section 1983 cases."). Rather, supervisory liability under § 1983 requires a plaintiff to demonstrate some "personal involvement" by the supervisory defendant regarding the challenged conduct. See id. ("Evidence of a supervisory official's 'personal involvement' in the challenged conduct is required.") (citations omitted); Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987) ("[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.").

The Second Circuit articulated the "personal involvement" requirement in the supervisory liability context in Hayut:

> "Personal involvement" is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

Hayut, 352 F.3d at 753 (citing Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)).

In Poe v. Leonard, 282 F.3d 123 (2d Cir. 2002), the plaintiff alleged that a Connecticut State Trooper violated her constitutional right to privacy by improperly videotaping her changing

30

her clothes during a break from filming a police training video.  Id. at 129.  The trooper's

supervisor was also named as a defendant under a theory of supervisory liability under § 1983.

The District Court denied the supervisor's motion for summary judgment based on qualified

immunity.  The Second Circuit reversed and held that a theory of supervisory liability must

> raise a triable issue of fact as to whether [the defendant] knew or should have known that
> there was a high degree of risk that [his subordinate] would behave inappropriately with a
> woman during his assignment, but either deliberately or recklessly disregarded that risk
> by failing to take action that a reasonable supervisor would find necessary to prevent such
> a risk, and that such failure caused a constitutional injury to [the plaintiff].

Id. at 142.

Here, Clarke has not submitted evidence creating a genuine issue of material fact under a

theory of supervisory liability against Chief Sweeney.  As there is no evidence that Sweeney was

aware of the events preceding Karen and B.J.'s homicides, he could not be held liable for "failing

to take corrective action after learning of a subordinate's unlawful conduct" or for "failing to act

on information regarding the unlawful conduct of subordinates."  Also, because he did not have

knowledge of their alleged unlawful acts, Sweeney may not be held liable for "gross negligence

in supervising subordinates who commit unlawful acts."  See Jones v. City of Hartford, 285 F.

Supp. 2d 174, 187 (D. Conn. 2003) ("The Second Circuit has equated gross negligence with

recklessness, and have defined it as the kind of conduct ... where [the] defendant has reason to

know of facts creating a high degree of risk of physical harm to another and deliberately acts or

fails to act in conscious disregard or indifference to that risk.") (citing Poe, 282 F.3d at 140 &

n.14).  Finally, Clarke has not presented evidence that would put Sweeney on notice (either

actual or constructive) of other situations where witnesses were not adequately protected by his

Department.  As Poe points out, notice of misconduct is a necessary antecedent to supervisory

31

liability for this type of § 1983 case.  See Poe, 282 F.2d at 146.

While Clarke has alleged that "Sweeney failed to train and supervise his officers in connection with proper procedures and techniques for protecting individuals who were being compelled to testify in criminal matters," Compl. at ¶ 11, which could arguably fall into the category of the "creation of a policy or custom fostering the unlawful conduct," one of the requirements of supervisory liability, noted above, is that the supervisor's action (or inaction) must have led to a deprivation of constitutional rights.  See Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."); Santana v. City of Hartford, 283 F. Supp. 2d 720, 728 (D. Conn. 2003) ("However, in order for [the defendant] to be liable as a supervisor, plaintiffs must first establish that one of [the defendant's subordinates] committed a constitutional tort.").  Here, as the Court has stated above, there was no constitutional deprivation arising from the BPD's failure to protect Karen and B.J. from the Peelers.  As there was no underlying deprivation of constitutional rights, accordingly there can be no supervisory liability for Sweeney based on the inadequacies of the BPD's witness protection program.  It bears repeating, though, that although the standard for imposing supervisory liability under § 1983 for a constitutional violation has not been met by the facts presented here, that is not to say that liability under a different or lesser standard of conduct could not be found.  For example, the Court leaves to another day–and perhaps, another court–the question of whether the BPD was negligent in the lack of protection provided B.J. and Karen Clarke.  The issue here, though, is whether the U.S. Constitution provides a remedy under the circumstances, and it does not.

32

_____4.  Qualified Immunity

_____Even if the Court had determined that there were genuine issues of material fact as to

whether Sweeney's actions or inactions led to a deprivation of Karen and B.J.'s constitutional

rights under theories based on his direct involvement or supervisory liability, he would be

entitled to qualified immunity.[22]  The law of qualified immunity is well settled in the Second

Circuit:

> Qualified immunity shields government officials from liability for civil damages as a
> result of their performance of discretionary functions, and serves to protect government
> officials from the burdens of costly, but insubstantial lawsuits.  Government actors
> performing discretionary functions are shielded from liability for civil damages insofar as
> their conduct does not violate clearly established statutory or constitutional rights of
> which a reasonable person would have known.  Even where the plaintiff's federal rights
> and the scope of the official's permissible conduct are clearly established, the qualified
> immunity defense protects a government actor if it was objectively reasonable for him to
> believe that his actions were lawful at the time of the challenged act.  The objective
> reasonableness test is met–and the defendant is entitled to qualified immunity–if officers
> of reasonable competence could disagree on the legality of the defendant's actions.

Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citations and internal quotation marks

omitted).  The Lennon Court "recogniz[ed] the apparent anomaly of holding that summary

judgment is appropriate when a trier of fact would find that reasonable officers could disagree."

_____

[22]As mentioned above, Clarke has sued Sweeney in his individual and official capacities.
The individual/official capacity distinction may not have significance in this case.  That
distinction has arisen as a means to avoid Eleventh Amendment immunity when suing state
officials.  See Kentucky v. Graham, 473 U.S. 159 (1985).  However, the Eleventh Amendment
does not usually apply to municipalities or their officials.  See Mt. Healthy City Sch. Dist. Bd. of
Ed. v. Doyle, 429 U.S. 274 (1977).  Thus, Sweeney and the City of Bridgeport may not assert
Eleventh Amendment immunity.  It may be, though, that Clarke has made that official capacity
designation to indicate a Monell claim against both the City and Sweeney, the latter as a
"policymaker," and that analysis is set forth below.

At any rate, the qualified immunity analysis applies to counts one through three against
Sweeney, including the supervisory claim.  See fn.23, infra.  It does not apply to count nine to the
extent that Sweeney is named as a policymaker under Monell.  See fn.26, infra.

Id. at 421.  However, the Second Circuit reasoned, "in qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action." Id.; see also Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 424 (S.D.N.Y. 2002) ("On a motion for summary judgment, the issue is whether a reasonable police officer would have known that what he was doing was clearly illegal based on the facts before him.").  Indeed, because one of the articulated purposes of qualified immunity is to prevent "fear of personal monetary liability and harassing litigation" from interfering with government officials' duties, "the identification and disposal of insubstantial claims by summary judgment is encouraged."  Lee v. Sandberg, 136 F.3d 94, 101-02 (2d Cir. 1997) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987) (internal quotation marks omitted)); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the qualified immunity entitlement is an "immunity from suit rather than a mere defense to liability . . . [it] is effectively lost if a case is erroneously permitted to go to trial.").

In determining whether a particular right was "clearly established" for purposes of assessing a claim of qualified immunity, the Second Circuit has instructed District Courts to consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991).  Here, for the reasons set forth above in the Court's analysis of the state created danger and special relationship exceptions to DeShaney, it was not clearly established that fact witnesses under a subpoena in a criminal prosecution are

34

constitutionally entitled to police protection, or that providing temporary visible protection of such individuals gives rise to such a right.[23]

Thus, defendant Sweeney is entitled to summary judgment on count one and the due process aspect of count three of the complaint.

## B.  Counts Two and Three - Equal Protection

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985). Although it is not entirely clear from the complaint, Pearline Clarke's opposition to the motion for summary judgment indicates that she is asserting two types of equal protection claims against Chief Sweeney based on two separate policies of the BPD she claims he established.  First, she asserts that the BPD had a policy of encouraging the cooperation of minorities in criminal investigations and that Karen Clarke and B.J. Brown's cooperation was encouraged by Sweeney pursuant to this policy.  Second, she makes a "selective enforcement" equal protection claim based on the alleged discriminatory application of the BPD's "facially neutral" policy regarding the protection of witnesses.  Each is addressed below.

---

[23]Moreover, to defeat a claim of qualified immunity asserted by a supervisory defendant, a plaintiff must not only demonstrate that the law controlling the alleged deprivation caused by the subordinate was clearly established, but that the theory of supervisory liability was clearly established as well.  See Poe, 282 F.3d at 134 ("We conclude that [the plaintiffs] must show that both laws were clearly established to lay the predicate for demonstrating that [the supervisory defendant] lacked qualified immunity: the law violated by [the subordinate] and the supervisory liability doctrine under which [the plaintiff] wishes to hold [the supervisory defendant] liable.").  Here, because it is not clearly established that Sweeney's subordinates violated Karen and B.J.'s constitutional rights, the Court need not specifically address whether the theory of supervisory liability asserted was clearly established.  However, it would also seem that supervisory liability under these circumstances was not "clearly established."

1. Discriminatory "Community Outreach" Policy

_____ "[A] law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender." Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999). Clarke claims that the BPD had a policy of community outreach, designed to encourage cooperation with the police in minority neighborhoods, which "selectively targeted the minority community. . . . This policy expressly classified persons on the basis of race. . . ." Pl.'s Mem. in Opp. to Mot. for Summ. J., at 28. As previously mentioned, Clarke has submitted evidence, specifically Sweeney's deposition testimony, from which a jury could conclude that such a policy existed. However, the fact that the policy existed is not sufficient. Clarke also must demonstrate that the policy *caused* the alleged deprivation. "Article III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . . and that the injury 'fairly can be traced to the challenged action.''" Valley Forge Christian College v. American United for Separation of Church and State, 454 U.S. 464, 472 (1982); Vermont Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 381 (2d Cir. 2000) (same).

Pearline Clarke has not submitted any evidence from which the jury could conclude that Karen Clarke or B.J. Brown had any knowledge of the alleged minority outreach program or that their cooperation with the prosecution was a result of such a policy. When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." Soto v. Meachum, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991). A party may not rely "on mere speculation or conjecture as to the true nature of the facts        to

36

overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.

1986), cert. denied, 480 U.S. 932 (1987).  The claimed link between the challenged BPD policy

of encouraging the cooperation of minority residents and the alleged constitutional deprivation

has not been shown and therefore cannot survive summary judgment.

        2. Selective Enforcement of Witness Protection Policy

        "In order to establish a violation of equal protection based on selective enforcement, the

plaintiff must ordinarily show (1) the person, compared with others similarly situated, was

selectively treated; and (2) that such selective treatment was based on impermissible

considerations," such as race.  LaTrieste Restaurant and Cabaret, 188 F.3d 65, 69 (2d Cir. 1999).

        Pearline Clarke alleges that "under Sweeney BPD had some informal policies in place to

protect its witnesses, but none were followed in this case" and that a jury could permissibly infer

that this non-enforcement was because of "discriminatory animus as applied to minorities" or

that "it [the informal policy] was applied in an intentionally discriminatory manner."  See Pl.'s

Mem. of Law in Opp. to Mot. for Summ. J., at 28-29.  However, even viewing the facts most

favorably to the plaintiff, there is no indication that similarly situated non-minorities were treated

differently pursuant to the "informal policies" regarding witness protection.  The only evidence

offered by the plaintiff in support of her selective enforcement claim is Sweeney's deposition

testimony to the effect that, in some previous situations, the BPD helped cooperating witnesses

relocate.  This is not sufficient to support a claim of selective enforcement because the record

does not contain any indication of the circumstances of these other cases from which a jury could

infer that those witnesses were "similarly situated in all material respects."  See Shumway v.

UPS, 118 F.3d 60, 64-65 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom

[the plaintiff] attempts to compare herself must be similarly situated in all material respects.")

(employment discrimination case). Moreover, Clarke has not submitted evidence to meet the

second prong of the selective enforcement test that the alleged "selective treatment" was based

on an impermissible consideration, such as race. There is no indication in the statements by

Sweeney relied upon by Clarke that indicate that the witnesses offered greater protection were of

a different race than Karen Clarke and B.J.

Thus, looking at the facts in a light most favorable to the plaintiff, Sweeney is entitled to

summary judgment as to counts two and three[24] of the complaint.[25]

## C.  Count Nine - Monell Claim Against the City of Bridgeport

Pursuant to Monell v. Dept. of Social Servs., 436 U.S. 658 (1978), a municipality may be

liable under § 1983 if the alleged constitutional deprivation was made pursuant to a policy or

custom of the municipality. 436 U.S. at 690-91.[26] In Monell, the Court acknowledged that the

text of the statute indicated that Congress intended to include municipalities among those subject

---

[24]That aspect of the supervisory claim in count three that alleges violations of Karen and B.J's rights to equal protection also fails because the underlying constitutional claim of count two is unsupported.

[25]Sweeney has also asserted qualified immunity as to the equal protection claim, but because evidence of causation to support this claim is so clearly lacking, the Court need not reach the issue of qualified immunity.

[26]Although it is not clear from the complaint, Clarke clarifies in her opposition to the motion for summary judgment that the Monell claim in count nine is also asserted against Chief Sweeney in his "official capacity" as a policymaker for the BPD. To the extent that count nine is asserted against Chief Sweeney as a policymaker for the City of Bridgeport, it will be treated as a claim against the City of Bridgeport. As it is well-settled that municipalities cannot avail themselves of qualified immunity, the qualified immunity analysis above is inapplicable to count nine of the complaint. See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 162, 166 (1993) ("[M]unicipalities do not enjoy immunity from suit--either absolute or qualified-- under § 1983").

to liability under § 1983.  Id. at 690.  However, the Court reasoned that "[t]he language of § 1983 . . . compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  Id. at 691.[27]  In order to assert a § 1983 claim against a municipality pursuant to Monell, the plaintiff must demonstrate (1) the existence of a municipal custom or policy, and (2) a direct causal link between the custom or policy and the violation alleged.  See City of Canton v. Harris, 489 U.S. 378, 385 (1989).

In count nine of the complaint Pearline Clarke points to a number of "policies, practices, customs, or usages" established by Sweeney as Police Chief and by the City of Bridgeport that she asserts resulted in the deprivation of Karen and B.J.'s constitutional rights.  They are: (1) "not properly protecting witnesses who were being compelled to testify in criminal matters"; (2) "not properly supervising employees to make sure that they protected" such witnesses; (3) "not properly training employees as to how to protect" such witnesses; and (4) "hiring and retaining police officers without properly screening such employees as to racial animus."  Compl., at ¶¶ 68-71.  Count nine also asserts that these various policies and practices caused Bridgeport police officers to believe that their actions, omissions, and misconduct would not be investigated, but would be tolerated.  See id. at ¶ 72.

In Amnesty America v. Town of West Hartford, __ F.3d __, 2004 WL 491647 (2d Cir. 2004), the Second Circuit recently recognized that "[m]ore often than not . . . plaintiffs allege constitutional deprivations at the hands of the lower-level municipal employees to whom some

---

[27]The relevant portions of § 1983 state that "Every person who . . . subjects or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities. . . ." 42 U.S.C. § 1983.

authority has been delegated, rather than at the hands of those officials with final policymaking

authority." Amnesty, 2004 WL 491647, at *10. However, because § 1983 does not permit

liability pursuant to respondeat superior,[28] a plaintiff asserting such a claim must "prov[e] that

'the authorized policymakers approved a subordinate's decision and the basis for it.'" Id. (citing

City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion)). Here, as noted

above, there is no evidence that Sweeney or any other identified policymaker for the City of

Bridgeport was aware of any of the events set forth above until after the homicides of B.J. and

Karen. Thus, there is no basis on which a jury could conclude that they "approved [the officers']

decision [not to afford protection to Karen and B.J.] and the basis for it." Id.[29]

Also, while Monell permits claims for the failure to have an adequate training program or

to adequately supervise employees, such claims also require a showing of "deliberate

indifference." See City of Canton v. Harris, 489 U.S. 378, 387 (1989) ("[T]he inadequacy of

police training may serve as the basis for section 1983 liability only where the failure to train

amounts to deliberate indifference to the rights of persons whom the police come into contact.").

Deliberate indifference in this context may be demonstrated by evidence that there were

---

[28]    A plaintiff suing a municipal authority under § 1983 must prove that the
constitutional wrong complained of resulted from the municipal authority's
official policy. See Monell v. Department of Soc. Servs., 436 U.S. 658, 691
(1978). As a result, the theory of respondeat superior does not apply to make
municipalities liable when one of their officials commits a constitutional tort. See
id. at 694.

    Clue v. Johnson, 179 F.3d 57, 62 (2d Cir. 1999).

[29]Also, "a failure to supervise claim requires allegations as to the violation itself and
policymakers' reaction to it." Amnesty, 2004 WL 491647, at *10, fn.8. There is no evidence of
any reaction by Sweeney or any other policymaker for the BPD regarding the failure of the BPD
to provide a higher level of protection to Karen and B.J.

"foreseeable serious consequences" that could result from the absence of an adequate training policy or that the municipality "fail[ed] to act in response to repeated complaints or constitutional violations by its officers."  Erwin Chemerinsky, Federal Jurisdiction, § 8.5 (4th ed. 2003) (citing City of Canton, 489 U.S. at 390, 398 and Farmer v. Brennan, 511 U.S. 825, 840 (1994)).  There was no evidence submitted that the City of Bridgeport or any of its policymakers ever received any complaints about failures to protect witnesses or about related constitutional violations that could have been remedied by instituting a better witness protection policy.

Moreover, even if Clarke could establish that it should have been reasonably foreseeable that the failure to train officers to better protect witnesses would have resulted in harm to individual witnesses, it was not foreseeable that it would result in a constitutional deprivation.  In Monell, the Supreme Court held that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell, 436 U.S. at 691.  Although City of Canton made clear that the municipal policy itself need not be unconstitutional, see City of Canton, 378 U.S. at 387, courts interpreting Monell and City of Canton have concluded that an underlying constitutional deprivation is a requirement for a Monell claim:

> [The plaintiff's] Monell claim requires an underlying constitutional deprivation, which [the plaintiff] is unable to demonstrate based on the record before this court.  See Quintanilla v. City of Downey, 84 F.3d 353, 356 (9th Cir.1996) (plaintiff could not recover on § 1983 claim against city or police chief absent showing that individual arresting officers violated his constitutional rights); Scott v. Henrich, 39 F.3d 912, 916 (9th Cir.1994) (municipality's liability under § 1983 pursuant to City of Canton, 489 U.S. at 389, was contingent on underlying violation of constitutional rights).

Cloninger v. Porter, 52 Fed. Appx. 333, at **2 (9th Cir. 2002).  See also Pearl v. City of Long Beach, 296 F.3d 76, 87 (2d Cir. 2002) ("[Monell held] that a municipality could be held liable

for constitutional torts committed pursuant to a municipal custom or policy."); Tatum v. City of
New York, 104 F.3d 351, at **1 (2d Cir. 1996) ("A municipality may be sued, pursuant to 42
U.S.C. § 1983, when it is alleged to have caused a constitutional tort through a policy statement,
ordinance, regulation, or decision officially adopted and promulgated by that body's officers.")
(citations and internal quotation marks omitted) (unpublished decision); Scott v. County of
Nassau, No. 94CV4291, 1998 WL 874840 *6 (E.D.N.Y. 1998) ("'[T]he touchstone of the § 1983
action against a government body is an allegation that official policy is responsible for a
deprivation of rights protected by the Constitution.' Monell, 436 U.S. at 690.  Plaintiff has not
established the existence of an underlying constitutional deprivation, and therefore, plaintiff's
allegations of municipal liability must be dismissed.") (unpublished decision).  As noted above,
witnesses under subpoena who have received police protection for a brief period are not denied a
constitutional right to substantive due process if not provided with continued protection.
Therefore, the failure of the City to have a better witness protection policy, or its failure to train
employees to ensure that they protected witnesses under subpoena, did not result in the violation
of Karen or B.J.'s constitutional rights, and therefore cannot serve as the basis for a Monell
claim.          Finally, the claim that the City failed to properly screen its employees for racial
animus is insufficient because Clarke has not submitted any evidence from which the jury could
infer that any BPD officer was hired or retained in such a way that the City knew or should have
known that the individual harbored racial animus, or that it caused any wrong here.

        Therefore, the defendants' motion for summary judgment is also granted as to count nine
of the complaint.

**V. Conclusion**

In granting summary judgment to the defendants on Clarke's federal claims, the Court finds no wrongs of constitutional dimension attributable to Chief Sweeney or the City of Bridgeport. It may very well be that the witness protection efforts of the Bridgeport Police Department, the State's Attorney's office, and others failed B.J. Brown and Karen Clarke.[30] However, every loss does not involve constitutional rights and every failure by law enforcement does not implicate substantive due process. See Hernandez v. City of Goshen, 324 F.3d 535, 538 (7th Cir. 2003) ("As the Supreme Court held in DeShaney . . . police departments have no constitutional duty to protect private persons from injuring each other, at least where the police department has not itself created the danger. Thus, no matter how egregious [plaintiff] might find [the defendants' response to] threats of private violence . . . the [defendants'] conduct was not unconstitutional."). While the homicides of Karen Clarke and B.J. Brown were tragic–and are made even more so because they might have been preventable–the failure to provide more protection to Karen and B.J. was not a violation of their rights under the United States Constitution.

Thus, for the preceding reasons, the defendants' motion for summary judgment [Doc. # 44] is GRANTED as to counts one, two, three, and nine of the complaint.

The Court further declines to exercise supplemental jurisdiction over the plaintiff's Connecticut state law claims on the ground that it has dismissed all claims over which it has original jurisdiction. See 28 U.S.C. § 1367(c)(3); Spear v. Town of West Hartford, 771 F. Supp.

---

[30]As mentioned, the Connecticut legislature has already responded to the Clarke-Brown homicides by requiring greater protection of witnesses. See Conn. Gen. Stat. §§ 54-82s - 54-82u ("The Leroy Brown, Jr. and Karen Clarke Witness Protection Program.").

521, 530 (D. Conn. 1991) ("[A]bsent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question claim already disposed of . . . ."), aff'd, 954 F.2d 63 (2d Cir.), cert. denied, 506 U.S. 819 (1992). Accordingly, the clerk is directed to close the case.

SO ORDERED this  30th  day of March 2004, at Hartford, Connecticut.


                                               /s/ CFD
_____                     _____
                                            **CHRISTOPHER F. DRONEY**
                                            **UNITED STATES DISTRICT JUDGE**

44